## STATE, Plaintiff-Appellee, v. SIMONIAN, Defendant-Appellant

Ohio Appeals, First District, Hamilton County.

Nos. 6568 and 6569.  Decided November 13, 1945.

Robert J. Paul, Cincinnati, Harry Meier, and Ralph E. Cors, Cincinnati, for plaintiff-appellee.

William F. Hopkins, Cincinnati, for defendant-appellant.

## OPINION

By ROSS, J.

These cases were heard together, being appeals upon questions of law from the Municipal Court of Cincinnati. The facts involved are the same in each case, except that two separate offenses involving separate gambling devices or machines were involved. The trials in the Municipal Court resulted in convictions and sentences, from which these appeals are taken. Both prosecutions were predicated on affidavits charging specifically violations of §13066, GC, in that it is stated that the defendant did "unlawfully, knowingly, wilfully keep and exhibit for gain a certain gaming device, commonly known as "Pin-Ball" called "5-10-20," in one case and "Arizona" in the other."

From the bill of exceptions it appears that the defendant

was a cook employed in a cafe known as Yacht Club, by one Lincoln Rice (sometime referred to as Jack). The defendant among other duties was required to "pay off" the machines in question, when players thereon succeeded in manipulating the same in such a manner as to cause them to register winning signals (hits). Police officers entered the cafe, operated the machines, and were paid off by the defendant for their winnings or "hits". The nickels used in paying off such winners were kept in a glass bowl, from which the defendant secured the nickels, all of this she did under direct instructions from her employer. The machines were introduced in evidence and have been brought before the court. They consist of rectangular boxes supported by legs, slightly longer in the rear than in the front, thus causing a slight fall in the box from the back to front.

The machines are operated partly by electricity and partly mechanically. Upon inserting a coin, five steel balls are released into a pocket from which the player may cause them severally to enter a groove. By pulling back a plunger which is controlled by a spring, and releasing the same, the steel ball being thus struck by the plunger is projected up the groove, and by force of gravity, or the force of impact with the rear wall of the box, caused to roll down toward the front of the box. A number of plugs or knobs are placed at various intervals in the box and the ball as it rolls down the box may strike any number of these plugs or knobs, causing an electrical contact. The action of the steel ball is affected to a certain extent by the distance to which the plunger is withdrawn. However, the element of chance is also present.

The score of the player is affected by the number of plugs or knobs which the ball contacts in its path from the back to the front of the box. By electrical connections, certain numerals are illuminated upon a panel rising from the rear of the box, showing the extent of the player's score. Premiums are paid for certain totals or "hits" caused by the operation of the steel balls coming in contact with the plugs or knobs. The player is able to "shoot" five balls and is entitled to the total score produced by their use.

It is admitted that the machines are gaming devices and were operated, kept, and exhibited by the defendant.

The sole defense urged is that neither she nor her employer made any personal profit from the operation of the machines, but, on the contrary, that her employer gave all profit from same to a charitable institution. The evidence upon this point is that the proprietor of the cafe—Lincoln Rice—leased the machines from one Ray Bigner, who called from

time to time and withdrew the coins deposited by players therein. That the owner would take 50% of such deposits as his rent for the use of the machines. Rice then deducted from his half of the deposit, amounts paid out to players as premiums, the differences being set aside until he had accumulated the sum of $50.00, when such sum was paid to Bigner, who sent a check to the charity designated by Rice. In the bill of exceptions it is stated:

"Q. (By Mr. Hopkins) What was your arrangement? In other words, what were you to get for rent?

A. Take 50 per cent of the gross amount of money that was in the machine.

Q. How often would you settle with Mr. Rice?

A. Every week.

Q. Every week. Directing your attention to on or about November 14, 1944, did you have a conversation with Mr. Rice?

A. I did.

Q. And as a result of that conversation, did you send a check any place?

A. I sent a check to the United State—Jack gave me $50 and asked me to send a check in to the Veterans—

Mr. Meiers: I will object to that testimony and ask it be stricken from the record.

The Court: Overruled.

Mr. Meiers: Exception.

Q. (By Mr. Hopkins) Did you give him a receipt?

A. I think I scribbled out a receipt on a piece of paper."

There is no evidence in the record that the defendant received anything directly from the operation of such gaming devices. The sole revenue received by her for services in the cafe was from her employer, in the shape of wages. The services rendered by the defendant in connection with the operation of the machines was purely incidental to her main occupation as cook in the cafe. The defendant testified:

"Q. As part of your employment, do you handle payoffs of this machine?

A. No, my job is cooking.

Q. You would pay off on this machine—you did on this particular day?

A. Yes. I was instructed by Mr. Rice to do that.

Q. You were instructed to do that by your employer?

A. That's right.

Q. And you are paid for that as being part of your employment?

A. No."

Rice testified:

"Q. Miss Simonian, the defendant in these cases, is an employee of yours?

A. That's right.

Q. How much do you pay her?

A. Thirty dollars a week.

Q. And what are her duties?

A. Well, she cooks, that's her job.

Q. And were you present the day the detectives came in and were paid off, and arrested Miss Simonian?

A. Yes, sir.

Q. And you saw her pay off these detectives?

A. No, sir, I did not.

Q. Isn't that part of her regular work when—

A. It is not her regular work, but I was upstairs.

Q. She does it quite frequently?

A. I couldn't say who pays them off.

Q. You are the owner of that place; why don't you know?

A. Well, probably that this—

The court: They are all authorized to pay off?

The witness: Yes, sir.

Q. (By Mr. Meiers) All of your employees are authorized to pay off on these machines?

A. That's right.

Q. And that includes Miss Simonian and she receives $30 a week?

A. That's right."

It may be seriously doubted whether the evidence shows that the defendant kept and exhibited these gaming devices for her own gain. Unless the sole defense interposed by the defendant is valid, there can be no doubt that they were operated for the gain of her employer. As the statute in question, §13066 GC, does not limit a violation to operation or exhibiting for **personal** gain and as no point is made of this by the defendant, it will not be further considered except in connection with the defense relied upon by defendant.

The sole defense set up by the defendant is that the machines were not operated for the gain or profit of the owner of the cafe, Rice, because he donated any such profit to a charitable institution, and, therefore, by reference to the

provisions of §13064 GC, the defendant is excused from any liability.

Before discussing this defense as stated by the defendant, other considerations are worthy of comment. In the first place, Rice did not keep and exhibit such machines under any notice thereon or in his establishment indicating they were operated for the benefit of any one but himself. In the next place, when the lessor settled with him one-half of the deposits of coins made by customers became his own individual property. What he did with such sum or any part thereof was his own personal affair. He could keep it all or donate it to charity or give it to another. Because he made a contribution to charity which was the exact equivalent of his profit from the operation of the machine, he claims the machines were not operated for his "own profit." In view of the fact that his share of the contents of the box came into his possession and especially remained so until he had accumulated $50, it may be seriously doubted whether his contention may be sustained, that such machines were not operated for his own profit. It may be noted also incidentally that in §13064 GC, the word charity is not used and it is apparent that all that would be necessary is that under that section the lottery or scheme of chance shall not be conducted for the profit of him who promotes the same.

Upon this phase of the case, therefore, the contention of the defendant would lead to this conclusion, that if one who is otherwise guilty of a violation of §13066, donates or gives to some other an amount equivalent to the profits obtained from the operation of a gaming device, he can not be considered guilty under such section by reason of the 1943 amendment of §13064 GC.

Aside from such considerations, however, it is apparent from an examination of §13064 and §13066 GC, that they are not in pari materia, and that their historical development shows that they are distinct and separate and that the implications applicable to §13064 GC, whatever they may be, cannot be applied or considered in connection with a prosecution under §13066, GC.

**Section 13064 GC,** as amended, and effective September 21, 1943, provides:

"Whoever, for his own profit, establishes, opens, sets on foot, carries on, promotes, makes, draws or acts as 'backer' or 'vendor' for or on account of a lottery or scheme of chance, by whatever name, style, or title denominated or known, whether located or to be drawn, paid or carried on within or without

this state, or by any of such means, sells or exposes for sale anything of value, shall be fined not less than fifty dollars nor more than five hundred dollars and imprisoned not less than ten days nor more than six months."

Section 13066, GC, which was in force in its present form at the time when §13064 GC, was amended, provides:

"Whoever keeps or exhibits for gain or to win or gain money or other property, a gambling table, or faro or keno bank, or a gambling device or machine, or keeps or exhibits a billiard table for the purpose of gambling or allows it to be so used, shall be fined not less than fifty dollars nor more than five hundred dollars and imprisoned not less than ten days nor more than ninety days, and shall give security in the sum of five hundred dollars for his good behavior for one year."

Specifically, the claim of the defendant is, then that because of the use of the words in §13064 GC, "his own profit" one does not violate the provisions of §13064 GC, when he uses the profits from the transactions therein prohibited for the benefit of charity, and that §13066 GC, being in existence at the time of the amendment, by which the legislature inserted such words in §13064 GC, that section too (§13066 GC) also is modified to the extent that one who keeps and exhibits a gaming device for the benefit of charity is not guilty of violating the provisions of §13066, GC.

In other words, one may not be found guilty under either section, when the profits received from the transactions or acts therein described are used for charity.

These two sections deal with two entirely different subjects, which will be shown to have been until recently completely isolated from each other.

Section 13064 GC, as amended, deals with a "lottery or scheme of chance." Section 13066 GC, deals with "a gaming table, or faro or keno bank or a gambling device or machine" or a "billiard table for the purpose of gambling."

Reference to the Ordinance of 1787, passed by the then Congress, for the government of the territory of the United States Northwest of the River Ohio, will show no mention either of lotteries or any form of gambling.

However, by a law passed by the Governor and Judges of the Northwest Territory at Vincennes, August 4th, 1790, in section 1, "any species of gaming, play or pastime whatever" whereby money may be won or lost was prohibited. In section 2 the use of billiard tables, faro, E. O. hazard, "or other

gaming tables, or any other machine" for gambling was prohibited.

See, Statutes of Ohio, S. P. Chase, Vol. 1, p. 104, 105.

By law promulgated by said Governor and Judges, "adopted from the Statutes of Virginia—Published July 16, 1795—to take effect October 1, 1795" by section 3 thereof—tavern keepers and inn holders were prohibited from permitting "cards, dice, billiards, or any instrument of gaming to be made use of" on the premises operated by them as such tavern or inn. Id. p. 199.

In 1802 the first Constitution of Ohio was adopted. Nowhere in this instrument is there direct reference to lottery or gambling. It is apparent, however, that it was not long until lotteries were recognized as lawful by both general and local or special acts of the legislature of Ohio.

By an act of the legislature passed January 30, 1807, it was made an offense to conduct a lottery "without a special act of the legislature."

Vol. 5 Ohio Laws (1806) p. 91.

See, 1 Chase's Statutes, p. 559.

Previous to this on February 14, 1805, the legislature had passed an act making various forms of gambling illegal. See, Chase's Statutes, Vol. 1, p. 503.

On January 27, 1807, the Ohio legislature passed "an act for raising by way of lottery money to repair and secure the bank of the Scioto on which the town of Chillicothe is built" Vol. 5, Ohio Laws (1806) p. 89. On January 28, 1807, this act was amended.

Vol. 5 Ohio Laws (1806) p. 105.

On January 31, 1807, the Ohio legislature passed "an act for raising by way of lottery money to build a bridge across the mouth of the Muskingum River."

Vol. 5, Ohio Laws (1806) p. 110.

On February 3, 1807, the legislature of Ohio passed "an act to raise money by way of lottery to improve the Navigation of the Cuyahoga and Muskingum Rivers."

Vol. 5, Ohio Laws (1806) p. 74.

On February 17, 1808, the act providing for a lottery to repair and secure the Scioto River was again amended.

Vol. 6, Ohio Laws (1807) p. 97.

On February 20, 1808, the act to provide for a lottery to pay for the bridge across the Muskingum River was amended. It is interesting to note that by this amendment it was provided that the original act "shall be good and valid as it respects the purposes therein mentioned to all intents as though no such omission had taken place, and all the acts and doings of

the managers therein appointed are hereby ratified and confirmed."

Vol. 6, Ohio Laws (1807) p. 174.

On January 4, 1811, the act to provide a lottery to raise funds to improve navigation on the Cuyahoga and Muskingum Rivers was amended.

Vol. 9, Ohio Laws (1810) p. 9.

On Jan. 14, 1812, the Act providing for a lottery for the purpose of raising funds to improve the Scioto River was again amended.

10 Ohio Laws (1811) p. 32.

On Feb. 20, 1812, the Cuyahoga and Muskingum Rivers Act was again amended.

Vol. 10 Ohio Laws (1811) p. 124.

On Jan. 28, 1813, by act of the Ohio Legislature, lottery tickets were made negotiable, and authority given to sue for sums paid for tickets when the lottery was not completed.

11 Ohio Laws (1812) p. 50.

By an act of the legislature, Jan. 4, 1814, various forms of gambling and the use of gaming tables was prohibited.

II Chase Statutes, p. 824.

On Feb. 2, 1824, the legislature by special act provided for a lottery for $25,000, proceeds thereof to be used by one Oliver Ornsby to replace a steam mill destroyed by fire in the City of Cincinnati.

Vol. 22, Local Ohio Laws (1823) p. 27.

On Jan. 16, 1828, by special act a lottery was provided, to rebuild a woolen factory in Lancaster, Fairfield County, for the benefit of one Elisha Barrett.

Vol. 26, Local Ohio Laws (1827) p. 52.

But, on February 22, 1830, the Ohio Legislature prohibited in language substantially the same as that used in §13064, GC, the further use of lotteries or schemes of chance for any purpose.

This inhibition was carried into the Constitution of 1851 by a provision—"Lotteries and the sale of lottery tickets for any purpose whatever shall forever be prohibited in this state."

Constitution of Ohio, 1851, Art. XV, section 6.

It will be seen, therefore, that up to this time (1830-1851) while such forms of gaming or gambling as are mentioned in §13066 GC, were the subject of constant and repeated legislation, providing punishment for indulgence therein and prosecutions proceeded thereunder, that the public policy of the state included approval of lotteries and schemes of chance enterprises now covered by §13064 GC. It is interesting also to note that when the people of the state adopted the Consti-

tution of 1851, nothing therein was said of gaming or gambling as such, nor in the amendments to that constitution later adopted. The prohibition of the Constitution is against lotteries and the sale of lottery tickets only.

The adverse attitude of the legislatures, even before the creation of the State, toward the employment of gambling machines or devices was so pronounced, and their use so adverse to the policy of the state, that it apparently was thought unneccessary to write any prohibition thereof into the Constitution. It was only because the legislatures had seen fit to employ the scheme of a lottery for public and private purposes that the people considered it necessary to prohibit lotteries in the Constitution.

In this connection, it may be noted that the constitutional provision, while it prohibits lotteries and the sale of tickets, is not self-executing in so far as violation of such provision may be the subject of a criminal prosecution. No penalty for such violation is provided for in the Constitution. It is left to the legislature to impose a penalty or not as it sees fit. Of course this privilege also applies to the forms of gambling long prohibited only by statute.

In the case of §13064 GC, therefore, since the legislature has provided no penalty for one who conducts a lottery or scheme of chance, where such lottery or scheme is not conducted for such person's "own profit", although the constitutional prohibition still remains, it is obvious that no criminal prosecution may be predicated upon such conduct, under such circumstances.

An examination of the various compilations of the statutes from such time (1830-1851) until the first publication of the General Code of Ohio, will show that the offense of conducting a lottery or scheme of chance was included usually under the title of "Crimes and Misdemeanors—Second Class," or a separate chapter devoted to lotteries and schemes of chance, and that offenses predicated upon the various forms of gambling covered by §13066 GC, were found in other chapters usually designated "Gaming" or "Gambling." A distinct line of cleavage was recognized between the conduct of a lottery and forms of gambling including those mentioned in §13066 GC.

III Chase Statutes of Ohio, p. 1656—p. 1878.

Statutes of Ohio, 1841 (Medary), p. 248, section 90, XLIV, (Lotteries) p. 426 Chapter 54, (Gaming).

Swan, Revised Statutes of Ohio, 1854, p. 292, section 141, Lottery (Crimes) p. 437, Chapter 51 (Gaming).

Public Statutes at Large of the State of Ohio, 1861, (Cur-

wen) p. 2375, section 44 (Lotteries) Crimes—p. 1194, Gambling p. 2483 (Gaming).

Sayler's Revised Statutes of Ohio, 1876—p. 2944, (Lottery) p. 3021, (Gambling).

Revised Statutes of Ohio, 1880 (Derby) Section 6929, sub-heading "Lotteries"; section 6932, et seq., sub-heading "Gaming and Betting."

Bates Accumulated Ohio Statutes 1897, under General Title "Offenses Against Public Policy", section 6929, sub-heading "Lotteries", section 6932, sub-heading "Gaming and Betting."

The General Code of Ohio, 1910, under general chapter "Gambling," §13064, Lottery and Scheme of Chance, §13066, Exhibiting Gambling Device. Here, for the first time, the several offenses appear grouped together under a common title without separation of any kind, as they now appear in the General Code.

Another consideration separating these two sections is worthy of comment.

In **Stevens v Cincinnati Times-Star Co., 72 Oh St 112,** at page 147, et seq. of the opinion, lottery is defined. It is apparent from this and other definitions that a lottery or even a scheme of chance, at least usually, involves participation by the public or a number of persons. On the contrary, the devices or machines mentioned in **§13066 GC,** are usually operated by one person who pits the result of his skill or luck against the keeper or exhibitor of the device. In the case of a lottery, it is a question of one or more persons succeeding in possessing the winning "lot", while in the case of gaming device it is a question, at least usually, of personal participation only. Lottery or the practice of "casting lots" is of ancient origin. "They parted my raiment among them and for my vesture they did cast lots."

From what has been said, therefore, it appears that §13064, GC, and §13066, GC, have distinct historical backgrounds, which, although such sections are now found in close proximity, associated under the common title of "Gambling," would clearly indicate that they are still to be disassociated and that unless provision as to one section is by specific language applied to the other, that a modification of one has no effect upon the other. Hence, the contention of the defendant cannot be maintained, and it is immaterial whether a violation of the prohibitions in **§13066 GC,** exists for the benefit, profit, or gain of the exhibitor of the gaming device, or for some person or persons other than himself, and even though such latter benefit may be considered of a charitable nature.

The judgments of the Municipal Court of Cincinnati are affirmed.

HILDEBRANT, P. J., MATTHEWS & ROSS, J. J., concur in syllabus, opinion & judgment.